Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/28/2020 09:08 AM CDT

State of Nebraska, appellee, v.
Augustine L. Cavitte, appellant.
___ N.W.2d ___

Filed July 7, 2020.    No. A-19-643.

1. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), appellate courts apply a two-part standard of review. With regard to historical facts, appellate courts review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law which appellate courts review independently of the trial court's determination.

2. **Motions for New Trial: Prosecuting Attorneys: Appeal and Error.** An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court.

3. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.

4. **Rules of Evidence: Other Acts.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Rev. Stat. § 27-404 (Reissue 2016), or under the inextricably intertwined exception to the rule.

5. **Miranda Rights.** The U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), adopted a set of safeguards to protect suspects during modern custodial interrogations.

6. ____. The safeguards under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are implicated whenever a person is in custody and interrogated.

7. **Miranda Rights: Self-Incrimination.** When a custodial interrogation occurs in the absence of *Miranda*-style procedural safeguards, an arrestee's self-incriminating statements are inadmissible in court.

8. **Miranda Rights.** *Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity.

9. **Miranda Rights: Constitutional Law: Time.** A suspect need not be advised of his or her constitutional rights more than once unless the time of warning and the time of subsequent interrogation are too remote in time from one another.

10. **Miranda Rights: Waiver.** A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

11. \_\_\_\_: \_\_\_\_. In determining whether a waiver of *Miranda* rights is knowingly and voluntarily made, a court applies a totality of the circumstances test, and factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct.

12. **Confessions: Police Officers and Sheriffs.** In determining whether an accused's statement was given freely and voluntarily, courts examine the tactics used by the police and the details of the interrogation.

13. \_\_\_\_: \_\_\_\_. While intoxication is relevant to determining whether police conduct amounted to coercion of a confession, intoxication does not automatically render a confession involuntary.

14. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, appellate courts first consider whether the prosecutor's acts constitute misconduct.

15. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

16. **Trial: Prosecuting Attorneys: Appeal and Error.** If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.

17. **Trial: Prosecuting Attorneys.** Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.

18. **Trial: Prosecuting Attorneys: Words and Phrases.** Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

19. **Judgments: Appeal and Error.** A correct result will not be set aside merely because the trial court applied the wrong reasoning in reaching that result.

20. **Rules of Evidence: Other Acts.** Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Bethany R. Stensrud for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Moore, Chief Judge, and Riedmann and Welch, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Augustine L. Cavitte appeals her conviction following a jury trial in the district court for Douglas County of one count of second degree domestic assault. On appeal, she argues the court erred in overruling her motions for a mistrial and a new trial, in admitting evidence of her prior bad acts, and in denying her pretrial motion to suppress. For the reasons set forth below, we affirm.

## II. BACKGROUND

In May 2018, Cavitte was charged in the county court for Douglas County with one count of domestic assault in the second degree, in violation of Neb. Rev. Stat. § 28-323(2) and (6) (Reissue 2016), a Class IIIA felony, following an altercation with her husband. Cavitte was subsequently bound over to the district court for Douglas County, where she was charged by information with the same count. She filed a motion to suppress her statements made to law enforcement on the night of the incident, arguing that the statements

were obtained in violation of her rights under the U.S. and Nebraska Constitutions.

At the hearing on Cavitte's motion to suppress, the State adduced testimony from Sgt. Cody Baines of the Omaha Police Department. Baines testified that on the evening of April 30, 2018, he responded to a call stating that a female had stabbed a male. When he arrived at the scene, Cavitte was handcuffed and placed in the back of a police cruiser, while the victim was transported for medical attention. Baines questioned Cavitte while she was in the police cruiser, inquiring as to her name, the victim's name, their relationship, and a brief description of what occurred. Her *Miranda* rights were then administered and questioning continued. Baines' questioning of Cavitte is laid out in greater detail in the analysis section below. Baines informed the court that while he was questioning Cavitte, it appeared that she had been crying and there was a moderate odor of alcohol emanating from her.

The State also provided testimony from Det. Derrick Kreikemeier, who interviewed Cavitte at the police headquarters. Prior to interviewing her, Kreikemeier inquired of Cavitte whether she remembered her *Miranda* rights previously administered or whether she needed them read again. She indicated she remembered, and Kreikemeier proceeded to interview her without reading them to her again. After initially telling Kreikemeier a false story, Cavitte told him that she had been staying at her husband's apartment for 3 days to work on marital issues. She became angry with him when he told her that he had been having an affair, and she grabbed a small knife and "glazed" him on the head with it. After "glazing" him, the two wrestled until she realized he was bleeding. She then wrapped his head in an article of clothing. Kreikemeier testified that he noticed an odor of alcohol on Cavitte and she was emotional, but that she appeared to be appropriately answering his questions. Kreikemeier also admitted that he had to redirect Cavitte multiple times during the interview.

Additional details regarding Kreikemeier's interview with Cavitte are provided below.

Following the suppression hearing, the district court overruled Cavitte's motion to suppress. The court determined that Cavitte was properly arrested, she was advised of her *Miranda* rights, and she knowingly and voluntarily waived her *Miranda* rights. A jury trial was held in March 2019. Prior to the start of trial, a discussion was held among the State, defense counsel, and the court regarding a statement Cavitte made to Kreikemeier that the abuse between her and her husband was "50/50." Defense counsel argued that the statement was improper under Neb. Rev. Stat. § 27-404 (Reissue 2016). The court disagreed, stating that the issue was discussed in chambers, its ruling had not changed, and it did not find that the statement was barred by § 27-404.

At trial, Baines and Kreikemeier testified consistently with their testimony at the suppression hearing. The State also offered into evidence audio recordings of Cavitte's telephone calls from jail following the altercation, as well as testimony from her husband's treating physician, who testified that her husband had four lacerations on his head which were not deep. Cavitte's defense consisted of testimony from an expert witness on domestic violence and intimate partner abuse, who testified generally regarding the nature of a relationship involving domestic violence. Cavitte also testified in her own behalf, stating that she "glazed" her husband in self-defense, after he choked and punched her. Cavitte was found guilty of second degree domestic assault and was sentenced to 3 years' probation. She timely appealed.

### III. ASSIGNMENTS OF ERROR

Cavitte assigns, restated, that the district court erred by (1) overruling her motion to suppress, (2) denying her motion for a mistrial and her motion for a new trial based on prosecutorial misconduct, and (3) admitting evidence of her prior bad acts under § 27-404.

## IV. STANDARD OF REVIEW

[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we apply a two-part standard of review. *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). With regard to historical facts, we review the trial court's findings for clear error. *Id*. Whether those facts suffice to meet the constitutional standards, however, is a question of law which we review independently of the trial court's determination. *Id*.

[2,3] An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

[4] An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under § 27-404, or under the inextricably intertwined exception to the rule. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

## V. ANALYSIS

### 1. *Miranda* Violations

Cavitte argues that the district court erred in overruling her motion to suppress statements made in violation of her rights under the Fifth Amendment to the U.S. Constitution and article I, section 7, of the Nebraska Constitution. Specifically, Cavitte alleges that the court erred in failing to suppress her statements made prior to receiving the *Miranda* warning, failing to suppress her statements made after receiving the *Miranda* warning, and in finding that her *Miranda* waiver was given knowingly, voluntarily, and intelligently. We disagree.

### (a) Pre-*Miranda* Statements

Cavitte argues that the district court erred in not suppressing statements she made while in custody in the police cruiser because she had not been advised of her rights pursuant to *Miranda v. Arizona, supra*. We disagree.

[5-7] The *Miranda* Court adopted a set of safeguards to protect suspects during modern custodial interrogations, which have also been implemented through Nebraska courts. *State v. Williams*, 26 Neb. App. 459, 920 N.W.2d 868 (2018). These safeguards are implicated whenever a person is in custody and interrogated. *Id*. It is undisputed that a person who is handcuffed and placed in a police cruiser's back seat is in custody. *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). When a custodial interrogation occurs in the absence of *Miranda*-style procedural safeguards, an arrestee's self-incriminating statements are inadmissible in court. See *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

Baines began questioning Cavitte at 12:10 a.m. while she was handcuffed in the back of his police cruiser, and he asked about her living arrangements, her relationship with her husband, and her injuries. After Cavitte informed him that she did not know she had any injuries, Baines asked, "If they happened, and they did happen, how do you think they happened?" Cavitte then responded that it was "a disagreement." Baines then questioned, "A disagreement with your husband? What did you guys disagree about?" Cavitte informed him that "we've been going through a lot in our marriage." Baines next stated, "You guys still love each other and it's tough, I understand," which prompted Cavitte to state that they had been married two times. Baines then requested another officer help him with the rights advisory and read Cavitte her *Miranda* rights at 12:12 a.m.

Cavitte asserts her statements that a "disagreement" occurred and that "we hurt each other" were incriminating statements. We disagree. First, although Cavitte asserts she stated that "we hurt each other" in response to Baines' questioning, and

Baines agreed with Cavitte's attorney's recitation of Cavitte's responses at the suppression hearing, our review of the audio recording of Baines' questioning of Cavitte does not reveal she stated that "we hurt each other" prior to her *Miranda* rights being given.

Further, even if Cavitte did state that "we hurt each other" in response to Baines' question about the nature of the disagreement between Cavitte and her husband, neither that statement nor Cavitte's assertion that a disagreement occurred is incriminating because Baines was questioning her about how she suffered her own injuries. The questions asked by Baines did not reference Cavitte's husband's injuries or whether Cavitte had caused his injuries.

Other jurisdictions have found that a law enforcement officer's pre-*Miranda* questions regarding a suspect's apparent injuries are valid. See, *State v. Ramos*, 317 Conn. 19, 31, 114 A.3d 1202, 1209 (2015) (police officer's question of "'what happened to you?'" made to defendant covered with blood was not to elicit incriminating response); *Archanian v. State*, 122 Nev. 1019, 145 P.3d 1008 (2006) (inquiry into suspect's medical condition not likely to elicit incriminating response); *Johnson v. State*, 269 Ind. 370, 377, 380 N.E.2d 1236, 1240 (1978) (officer's question of "what happened" to defendant with blood on face was valid). Therefore, because Baines' question of "how do you think [your injuries] happened?" was not intended to elicit an incriminating response, but, rather, was meant to inquire into Cavitte's welfare, it was not a *Miranda* violation.

Cavitte argues that Baines' question was similar to that in *State v. Juranek*, 287 Neb. 846, 849, 844 N.W.2d 791, 797 (2014), where the officer asked, "'Do you want to tell it to me?'" before providing the suspect with his *Miranda* rights, which the court determined was a *Miranda* violation. However, in *Juranek*, directly before the officer asked, "'Do you want to tell it to me?'" the suspect had stated that he had already told "'it,'" meaning his confession, to another officer "'14

times.'" 287 Neb. at 849, 844 N.W.2d at 797. Thus, the court determined that the officer's use of the word "it" referred to the suspect's confession, which the officer should have known would likely elicit an incriminating response. *Id*. Here, Baines' question was in reference to Cavitte's injuries and how she obtained them; they were not intended to elicit an incriminating response.

Accordingly, the district court did not err in receiving Cavitte's pre-*Miranda* statements.

### (b) Post-*Miranda* Statements

Cavitte also asserts that her statements made to Kreikemeier should have been suppressed, because the statements were made during the continuation of a custodial interrogation begun before the *Miranda* warning was administered. Cavitte's argument that her post-*Miranda* statements should have been suppressed is predicated on the argument that her pre-*Miranda* statements were a confession. However, as stated above, we do not find her pre-*Miranda* statements to have been a confession. Nonetheless, we address Cavitte's argument that her post-*Miranda* confession should have been suppressed. We disagree.

Cavitte bases her argument on *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), in which the U.S. Supreme Court addressed the two-step interrogation technique of (1) giving *Miranda* warnings only after an interrogation has produced a confession and then (2) questioning the suspect so as to cover the same ground a second time, but with *Miranda* warnings in place. See *State v. Juranek, supra*. A plurality of the U.S. Supreme Court concluded that "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" See *Missouri v. Seibert*, 542 U.S. at 613-14 (quoting *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135,

89 L. Ed. 2d 410 (1986)). Accord *State v. Juranek, supra*. The plurality explained that when a suspect is advised of his or her *Miranda* rights in the middle of an interrogation, the issue becomes whether the warnings effectively advised that he or she "could choose to stop talking even if he [or she] had talked earlier." See *Missouri v. Seibert*, 542 U.S. at 612. Accord *State v. Juranek, supra*. Of particular significance to the Court's conclusion that the pre-*Miranda* confession made the later *Miranda* warnings ineffective was the fact that questioning before the *Miranda* warnings was "systematic, exhaustive, and managed with psychological skill" to such an extent that after the unwarned interrogation, "there was little, if anything, of incriminating potential left unsaid." See *Missouri v. Seibert*, 542 U.S. at 616. Accord *State v. Juranek, supra*.

In *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014), the Nebraska Supreme Court determined that the *Miranda* warning issued during an interrogation, but after incriminating statements had been made, did not invalidate the post-*Miranda* statements because the initial interrogation consisted of one question that was not focused on the key points of the investigation. In *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017), the court found that the defendant was questioned for 5 minutes prior to receiving the *Miranda* warning, mostly about background information, and the defendant did not make any incriminating statements; thus, the post-*Miranda* confession was valid. Finally, in *State v. Williams*, 26 Neb. App. 459, 920 N.W.2d 868 (2018), this court held that the defendant's post-*Miranda* confession was admissible because his pre-*Miranda* statements did not go to many of the key points of the investigation.

Here, as iterated above, Cavitte did not make any incriminating statements to Baines before receiving the *Miranda* warning. Thus, as in *State v. Clifton, supra*, her post-*Miranda* confession was admissible. Even if we were to find that Cavitte made incriminating statements to Baines, her post-*Miranda* confession to Kreikemeier would not be void, because Baines'

questioning did not go to the key points of the investigation. Baines merely asked how Cavitte was injured and what the nature of her disagreement was with her husband. Her confession to Kreikemeier was much more detailed and was not simply a restatement of her "confession" to Baines.

Cavitte further asserts that her confession to Kreikemeier should have been suppressed because Kreikemeier did not re-administer the *Miranda* warning to her prior to questioning her. We disagree.

First, while Kreikemeier did not provide Cavitte with her *Miranda* rights, he ensured that she recalled the rights advisory that Baines went over with her. At the start of the interview, Cavitte made a statement about the length of her relationship with her husband. Before asking any questions, Kreikemeier asked her if she remembered the rights advisory form that the officers at the scene went over with her. Cavitte nodded her head and indicated that she did. Kreikemeier again asked if she recalled the rights or if he needed to go over them again with her. Cavitte asked, "If I say I recall does that mean I'm going to jail?" After informing Cavitte that he was there to get her side of the story, Kreikemeier again asked if she recalled the rights advisory and informed her that if she did not recall, he would go over the rights with her again. Cavitte once again indicated that she recalled the rights advisory.

[8,9] *Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity. *In re Interest of Miah S.*, 290 Neb. 607, 861 N.W.2d 406 (2015). However, a suspect need not be advised of his or her constitutional rights more than once unless the time of warning and the time of subsequent interrogation are too remote in time from one another. *Id*. There is no fixed time limit as to how much time must pass before the warnings are ineffective. *Id*. Thus, in *In re Interest of Miah S., supra*, the Supreme Court determined that 24 hours between the *Miranda* warning and subsequent interrogation did not render the warning ineffective.

The Supreme Court also enunciated several factors to consider whether a *Miranda* warning has expired, including:

"(1) the length of time between the giving of the first warnings and subsequent interrogation . . . ; (2) whether the warnings and the subsequent interrogation were given in the same or different places . . . ; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers . . . ; (4) the extent to which the subsequent statement differed from any previous statements . . . ; (5) the apparent intellectual and emotional state of the suspect."

*In re Interest of Miah S.*, 290 Neb. at 615, 861 N.W.2d at 414. See, also, *State v. Williams*, 26 Neb. App. 459, 920 N.W.2d 868 (2018) (citing *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004)).

When examining the above factors, it is clear the district court did not err in overruling Cavitte's motion to suppress. First, the interrogations took place roughly 2 hours apart, which is a far shorter period than the 24 hours deemed proper in *In re Interest of Miah S., supra*. Next, and importantly, prior to questioning Cavitte, Kreikemeier asked multiple times whether she recalled the rights advisory Baines issued to her and told her that if she did not, Kreikemeier would go over it with her. Cavitte responded that she remembered the rights advisory and did not need to hear it again.

The Supreme Court in *In re Interest of Miah S., supra*, found the juvneile defendant's insistence that he recalled the *Miranda* warning was a strong factor in determining that the warnings were still fresh. Although Cavitte was questioned by different officers and in different locations, both Baines and Kreikemeier were part of the same law enforcement department and questioned her regarding the same offense; thus, there was less risk of confusion than if the officers were from different agencies or questioned the suspect about separate offenses. See *In re Interest of Miah S., supra*. Therefore, in light of the fact that just a short period of time had passed

between the time Cavitte received the *Miranda* warning and when she was questioned by Kreikemeier, and because she indicated to Kreikemeier that she recalled her rights and did not need the advisory again, Kreikemeier was not required to administer *Miranda* warnings a second time to Cavitte.

Accordingly, the district court did not err in overruling Cavitte's motion to suppress her post-*Miranda* statements.

### (c) Valid Waiver of Rights

Finally, Cavitte argues that the district court erred in overruling her motion to suppress because she was intoxicated and did not knowingly, intelligently, and voluntarily waive her Fifth Amendment rights. We disagree.

[10,11] *Miranda* warnings are a prerequisite to interrogation, and fundamental with respect to the Fifth Amendment privilege. See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. *State v. Burries, supra*. A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *State v. Burries, supra*. In determining whether a waiver is knowingly and voluntarily made, a court applies a totality of the circumstances test, and factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct. *Id*.

[12,13] In determining whether an accused's statement was given freely and voluntarily, courts examine the tactics used by the police and the details of the interrogation. See *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). Other relevant factors include any characteristics of the accused known to police, which might cause his or her will to be easily overborne, such as a defendant's mental state or intoxication. *Id*. However, while intoxication is relevant to determining whether police conduct amounted to coercion, intoxication

does not automatically render a confession involuntary. *Id*. Concerning intoxication, the Supreme Court has stated that the defendant must be so intoxicated that he or she is unable to understand the meaning of his or her statements. *State v. Williams*, 269 Neb. 917, 697 N.W.2d 273 (2005). If the trial judge is satisfied that under the totality of the circumstances the defendant was able to reason, comprehend, or resist, the statements are to be admitted. *Id*.

Here, the district court determined that Cavitte was not intoxicated to the point that her waiver of her *Miranda* rights was invalid. The court found that Cavitte did not give any indication to Baines or Kreikemeier that she did not understand her rights, that her off-topic statements and mumbled answers did not render her confession involuntary, and that neither Baines nor Kreikemeier used coercive actions to overbore Cavitte's free will. Based on the record before us, we do not find that the district court erred in overruling Cavitte's motion to suppress.

The video taken from inside the police cruiser indicates that Baines was calm and polite when questioning Cavitte and that Cavitte's responses were appropriate to the questions asked. Cavitte did not give any indication that she did not understand her rights when Kreikemeier asked her whether she remembered when Baines previously advised her of her rights. Further, while both Baines and Kreikemeier indicated that Cavitte had an odor of alcohol emanating from her, and Cavitte informed Kreikemeier that she had been drinking, neither officer found her to be intoxicated to the point she did not understand their questions. The record reflects this assertion, as Cavitte generally provided appropriate answers to the questions asked. The district court determined that, although Cavitte did have to be redirected occasionally by Kreikemeier, she was coherent and able to understand the questions posed to her.

On appeal, Cavitte asserts that the coercive tactics employed by Kreikemeier, including the size of the interview

room and the fact that Kreikemeier lied to her and used profanity, combined with her intoxication, overcame her free will. The district court, after examining the evidence and observing the witnesses, determined that coercive tactics were not used. This was not clearly erroneous. As iterated above, Kreikemeier did not coerce her to speak with him by offering leniency or using threats. Based on the evidence before us, the district court did not err in determining that Cavitte's waiver of her *Miranda* rights was done knowingly, intelligently, and voluntarily.

The district court did not err in overruling Cavitte's motion to suppress, because she did not provide an incriminating statement prior to receiving a *Miranda* warning and her post-*Miranda* confession was not invalid. Further, the record indicates that Cavitte knowingly, intelligently, and voluntarily waived her *Miranda* rights.

## 2. Prosecutorial Misconduct

Cavitte asserts that the district court erred by overruling her motion for a mistrial and her motion for a new trial based upon prosecutorial misconduct by the State. We disagree, and we find that the district court did not abuse its discretion in overruling Cavitte's motions.

During its closing argument, the State argued that Cavitte had given a variety of different stories and that now it came down to what the jury should believe. Referencing the different versions of events, it framed Cavitte's defense as follows:

> Believe me then, but don't believe me now? Believe me as I stand up here and testify to my own story that's not making sense, ten and a half months after this took place when I was in an interview room with a detective for over an hour and during no time did I state anything about [my hisband's] using any threats against me, [his] using any force against me, prior to me cutting him?

Later in its closing, the State emphasized, "And nowhere in the ten and a half months leading up to this trial was there

any evidence that she tried to reach out to law enforcement to change her story." And again, stating:

It doesn't make sense that [Cavitte], mere hours after the assault and after being in contact with law enforcement for hours, intending to get her side of the story from her, is just now informing us of this self-defense ten and a half months after the assault took place. And even when she's questioned about what happened, then she backtracks and isn't able to remember what happened.

After the State finished its closing argument, Cavitte moved for a mistrial, asserting that the State was attempting to use her silence regarding her claim of self-defense against her and shifting the burden of proving self-defense to her. The court denied the motion. After trial, Cavitte filed a motion for a new trial, arguing, in relevant part, misconduct of the prosecuting attorney which prevented her from having a fair trial. The court subsequently overruled the motion for a new trial, finding that the State did not shift the burden of proving self-defense to Cavitte and did not improperly comment on her postarrest silence.

[14-16] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *Id*. But if we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial. *Id*.

[17,18] Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial. *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016). While a prosecutor should prosecute with "'earnestness and vigor'" and "'may strike hard blows, he is not at liberty to strike foul ones.'" *Id.* at 645, 884 N.W.2d at 117. Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts

because the conduct will or may undermine a defendant's right to a fair trial. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). Prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial, and prosecutors are not to inflame the prejudices or excite the passions of the jury against the accused. *Id.*

While prosecutors are prohibited from stating a personal opinion as to the credibility of a witness, or the guilt or innocence of an accused, they are permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense, when their comments rest on reasonably drawn inferences from the evidence. *State v. Gonzales, supra* (citing *State v. Dubray, supra*). Thus, in cases where the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence. *Id.*

As indicated above, the State's comments during closing, when examined in the context of the full trial, were in reference to Cavitte's multiple versions of her story that she told law enforcement officers; thus, her credibility was called into question. Such comments went to the veracity of her defense and her credibility, and they were not prosecutorial misconduct.

On appeal, Cavitte argues that the State's comments throughout the case infringed on her right against self-incrimination and improperly shifted the burden to her to prove self-defense. She asserts that the State's comments were similar to comments made by the State in *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988), and *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). We disagree.

Cavitte's argument that the State improperly commented on her post-*Miranda* silence regarding her defense of self-defense

is derived from the U.S. Supreme Court's holding in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). In *Doyle*, the petitioners were arrested for selling marijuana and did not make any statements about their involvement in the crime after receiving *Miranda* warnings. At trial, the petitioners testified they were framed by a government informant. *Id*. On cross-examination, the prosecutor repeatedly inquired why the petitioners did not inform police of their explanation for their offense following their arrest. *Id*. The Court held that prosecutors were prohibited from using a defendant's post-*Miranda* silence for impeachment purposes. *Doyle v. Ohio, supra*.

The U.S. Supreme Court later distinguished *Doyle* from scenarios where a defendant did not exercise his or her right to remain silent, but, rather, provided law enforcement with a different story than what was later testified to at trial. In *Anderson v. Charles*, 447 U.S. 404, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980), the respondent was arrested and charged with first degree murder after he was discovered driving the victim's stolen vehicle. After being arrested and receiving his *Miranda* warning, the respondent informed officers that he stole the vehicle from the street about 2 miles from a local bus station. *Anderson v. Charles, supra*. However, at trial, the respondent stated that he stole the unattended vehicle from a parking lot directly next to the bus station. *Id*. The Court held that it was not improper for the prosecutor to question the respondent regarding his past inconsistent statements made after receiving a *Miranda* warning. *Anderson v. Charles, supra*. Distinguishing *Doyle*, the Court stated:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the

subject matter of his statements, the defendant has not remained silent at all.

*Anderson v. Charles,* 447 U.S. at 408.

The Court's holding in *Anderson v. Charles, supra*, has been applied in similar factual scenarios as the present case in numerous federal and state courts. See, *U.S. v. May*, 52 F.3d 885 (10th Cir. 1995); *Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir. 1985) (defendant did not remain silent after *Miranda* warning; thus, prosecutors' questions about inconsistent stories did not violate *Doyle v. Ohio, supra*); *Lofton v. Wainwright*, 620 F.2d 74 (5th Cir. 1980) (not improper for prosecutors to use defendant's post-*Miranda* statements to contradict inconsistent trial testimony); *State v. McReynolds*, 288 Kan. 318, 202 P.3d 658 (2009).

Here, Cavitte did not exercise her right to remain silent after receiving the *Miranda* warning. Rather, she confessed to Kreikemeier that she became angry with her husband when he told her that he had been having an affair and "glazed" him in the head. However, at trial, she testified that she was acting in self-defense after he choked and punched her. Thus, her inconsistent statements are not governed by *Doyle v. Ohio, supra*, but by *Anderson v. Charles, supra*. Accordingly, the State's comments during closing argument and throughout trial regarding Cavitte's credibility and inconsistent stories do not constitute misconduct.

[19] Although the district court denied Cavitte's motion for a new trial under an analysis of *Doyle v. Ohio, supra*, and not *Anderson v. Charles, supra*, it reached the correct result that the State's comments were not improper. A correct result will not be set aside merely because the trial court applied the wrong reasoning in reaching that result. *State v. Kolbjornsen*, 295 Neb. 231, 888 N.W.2d 153 (2016).

In light of the above, Cavitte's reliance on *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988), in which the court found the prosecutor's references to the defendant's post-*Miranda* silence, specifically that the defendant did not inform law

enforcement of his story, which would have enabled them to corroborate his version of events, were improper because they violated *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), is misplaced. As iterated above, Cavitte did not exercise her right to remain silent; thus, the State was not impermissibly commenting on her post-*Miranda* silence, but, rather, it was attacking her credibility due to the inconsistent versions of the altercation she provided.

Cavitte's reliance on *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017), as it relates to burden shifting is equally misplaced. In *Rocha*, the Supreme Court found that the State's questioning of a witness regarding whether the defendant had conducted his own independent DNA and fingerprint testing was improper because it may have misled the jury to believe the defendant had the burden to produce evidence to prove his innocence. Here, the State did not place the burden on Cavitte to prove that she acted in self-defense. The State merely emphasized that the more credible version of her story was what she told Kreikemeier immediately following the incident, and not her version of the events told at trial.

Upon our review of the record, the district court did not abuse its discretion when it denied Cavitte's motion for a mistrial and motion for a new trial because the State's comments at issue did not constitute misconduct. Further, because the State did not commit prosecutorial misconduct, we do not need to address whether Cavitte was prejudiced by the alleged misconduct.

### 3. INEXTRICABLY INTERTWINED EVIDENCE

Cavitte next argues that the district court erred by admitting evidence of her prior bad acts in violation of § 27-404. Specifically, Cavitte argues that her statement that the abuse between her and her husband was "50/50" was evidence of prior bad acts, and should have been excluded under § 27-404. We disagree.

Section 27-404(2) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[20] The Supreme Court has stated that § 27-404(2)'s list of permissible purposes is not exhaustive. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). Nonetheless, § 27-404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *State v. Burries, supra*. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id*.

In *State v. Burries, supra*, the defendant was convicted of first degree murder for killing his girlfriend. In his appeal, the defendant asserted that the trial court erred in admitting evidence of an assault of the victim committed by him 2 years before the murder. *Id*. The defendant argued that the evidence was prohibited by § 27-404(2). The Supreme Court found that the previous assault was inextricably intertwined with the murder because it was part of the factual setting of the murder. *State v. Burries, supra*. Specifically, the court found that while the defendant was in prison for the prior assault, he would call and threaten the victim; after being released from prison, he continued to threaten the victim; the victim had injuries consistent with an assault prior to her murder; and the defendant told police that he burned his clothes after the murder because they still had blood on them from the assault. *Id*. Thus, the court concluded that the evidence of the prior

assault was necessary to present a coherent picture of the murder. *Id.*

In the case before us, which is similar to *State v. Burries, supra*, the district court did not err in admitting Cavitte's statement that the abuse between her and her husband was "50/50" because the statement was necessary to present a coherent picture of the assault. The State's theory of the case was that Cavitte became angry after her husband informed her that he had been having an affair, and she then assaulted him. Cavitte's theory at trial was that she and her husband began arguing and that he then choked and punched her, which led her to stab him. Therefore, the nature of the relationship between Cavitte and her husband, including the fact that each abused the other, was necessary to present a coherent picture of the assault.

Cavitte argues that her case is akin to *State v. Woods*, 6 Neb. App. 829, 577 N.W.2d 564 (1998), where this court found that the trial court erred by admitting evidence that the defendant had received controlled substances without a prescription on previous occasions. This court found that the evidence fell under the constraints of § 27-404 and that a hearing should have been held outside the presence of the jury to determine the admissibility of the evidence. Here, unlike in *Woods*, Cavitte's statement that the abuse between her and her husband was "50/50" was necessary to understand the circumstances of the assault at issue. It was not referring to a specific past assault; rather, it was necessary to form a coherent picture of the relationship between Cavitte and her husband.

Cavitte also urges this court to follow the Supreme Court's holding in *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013). In *Ash*, the court reversed the trial court's receipt of evidence that the defendant had sold the victim's jacket 2 days prior to his murder. The court determined that the selling of the victim's jacket was not part of the factual setting for the murder and did not fall under the circumstances under which the court had previously applied the inextricably intertwined

exception. *Id*. However, in the case at bar, Cavitte's statement that the abuse in the relationship occurred "50/50" was part of the factual setting of the offense, because it offered insight into the nature of Cavitte's relationship with her husband; therefore, *Ash* is not instructive for our analysis.

Based on the record before us, and given the factual similarities between the present case and those of *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017), we find that the district court did not abuse its discretion in admitting Cavitte's statement that the abuse between her and her husband was "50/50."

## VI. CONCLUSION

Having found no error in the orders and rulings challenged by Cavitte herein, we affirm her conviction.

AFFIRMED.